UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

ROSITA BRENNAN, *et al.*                )
                                        )
Plaintiffs,                             )          Case No. 2:18-cv-09366
                                        )
                                        )
                                        )
                                        )          **PLAINTIFFS' ORIGINAL**
                                        )          **COMPLAINT AND JURY DEMAND**
                                        )
                                        )
                                        )
vs.                                     )
                                        )
                                        )
VOLKSWAGEN GROUP OF AMERICA             )
INC. *et al.*,                          )
                                        )
Defendants.                             )

### PLAINTIFFS' ORIGINAL COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs listed below (referred to herein as "Plaintiffs") file this Original Complaint and Jury Trial Demand complaining of Defendants Volkswagen Group of America, Inc., Volkswagen Aktiengesellschaft, Audi Aktiengesellschaft, and Audi of America, LLC.

### THE PARTIES

### PLAINTIFFS

1.      Plaintiff Rosita Brennan is a citizen of the State of California who acquired a 2016 Audi A6 in the State of California.

2.      Plaintiff Chris Bartolomeo is a citizen of the State of Nevada who acquired a 2015 Audi SQ5 in the State of California.

1

3.      Plaintiff Hank Clemmons is a citizen of the State of California who acquired a 2015 Audi A7 in the State of California.

4.      Plaintiff Scott Cooper is a citizen of the State of California who acquired a 2012 Audi A6 in the State of California

5.      Plaintiff Carlos D'Abreu is a citizen of the State of Texas who acquired a 2013 Audi Q5 in the State of California.

6.      Plaintiff Rod Egdorf is a citizen of the State of California who acquired a 2015 Audi Q5 in the State of California.

7.      Plaintiffs John Hejtmanek and Sandra Hopkins are citizens of the State of California who acquired a 2012 Audi A6 in the State of California.

8.      Plaintiff Thomas Hunter is a citizen of the State of Virginia who acquired a 2015 Audi A8 in the State of California.

9.      Plaintiff Josephine Kernozek is a citizen of the State of California who acquired a 2013 Audi Q5 in the State of California.

10.      Plaintiff Steven Marshalek is a citizen of the State of California who acquired a 2012 Audi A8 in the State of California.

11.      Plaintiffs Martin Menichiello and Denise Menichiello are citizens of the State of California who acquired a 2013 Audi A7 in the State of California.

12.      Plaintiff Lucy Milivojevic is a citizen of the State of California who acquired a 2015 Audi A6 in the State of California.

13.      Plaintiffs Michelle Morse and Vince Morse are citizens of the State of California who acquired a 2012 Audi Q5 in the State of California.

14.     Plaintiff Dexter Myers is a citizen of the State of Nevada who acquired a 2015 Audi A7 in the State of California.

15.     Plaintiffs Nan Cheng Newman and Matthew Newman are citizens of the State of California who acquired a 2015 Audi A7 in the State of California.

16.     Plaintiffs Gregg Primeaux and Melanie Primeaux are citizens of the State of California who acquired a 2015 Audi Q5 in the State of California.

17.     Plaintiff Karl Schonian is a citizen of the State of California who acquired a 2015 Audi A8 in the State of California.

18.     Plaintiffs Stan Slaton and Alice Slaton are citizens of the State of California who acquired a 2016 Audi A6 in the State of California.

19.     Plaintiff Andrew Stein is a citizen of the State of California who acquired a 2014 Audi A8 in the State of California.

20.     Plaintiff Richard Vera is a citizen of the State of California who acquired a 2016 Audi A6 in the State of California.

21.     Plaintiff Bill Weiss is a citizen of the State of California who acquired a 2012 Audi A7 in the State of California.

22.     Plaintiff Daneng Xiong is a citizen of the State of California who acquired a 2014 Audi A6 in the State of California.

23.     Plaintiffs Humberto Yniguez and Helen Yniguez are citizens of the State of California who acquired 2013 Audi A7 in the State of California.

## DEFENDANTS

24.     Volkswagen Aktiengesellschaft ("VW AG") is a German corporation with its principal place of business at Berliner Ring 2, 38440 Wolfsburg, Germany.  VW AG may be served

with process through its wholly owned U.S. subsidiary, Volkswagen Group of America, Inc., 2200 Ferdinand Porsche Dr., Herndon, VA 20171.  VW AG may be served with process either by serving any officer or director of Volkswagen Group of America, Inc., at 2200 Ferdinand Porsche Dr., Herndon, VA 20171 or by serving Volkswagen Group of America, Inc. through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

25.     Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VW America may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.  VW America is a wholly-owned subsidiary of VW AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.

26.     Defendant Audi Aktiengesellschaft ("Audi AG"1`) is a German corporation with its principal place of business at Auto-Union-Straße 1, 85045 Ingolstadt, Germany.  Audi AG may be served with process either by serving any officer or director of Volkswagen Group of America, Inc., at 2200 Ferdinand Porsche Dr., Herndon, VA 20171 or by serving Volkswagen Group of America, Inc. through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

27.     Defendant Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi America may be served with process at 2200 Ferdinand Porsche Dr.,

Herndon, VA 20171.   Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

28.    For purposes of this Complaint, VW AG, VW America, Audi AG, and Audi America shall collectively be referred to as the "Audi Gasoline Defendants," or "Audi."

## AGENCY

29.    At all relevant time to the allegations in this lawsuit, VW America, Audi AG, and Audi America were the agents of VW AG and all misrepresentations at issue in this lawsuit and described below in more detail were made with knowledge and intent by VW AG, VW America, Audi AG, and Audi America that the misrepresentations would be repeated to third-parties, like Plaintiffs, and that such third-parties would rely on them

## JURISDICTION AND VENUE

30.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

31.    The Court has jurisdiction over Defendants for the reasons discussed above (see discussion supra).  This Court also has jurisdiction over Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce numerous diesel automobiles, including the diesel automobiles at issue in this case.  In addition, the fraudulent statements and omissions occurred, in part, in this district.  Defendants also conduct business in California and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in California.  Personal jurisdiction is proper in California

over Defendants because they caused tortious injury by an act or omission in California and because they transact substantial business in California.

## FACTUAL BACKGROUND

### The Basics

32.     This lawsuit is about a fraudulent deceptive scheme to deliberately lie, cheat and intentionally deceive consumers about the characteristics, benefits and value of certain automotive vehicles (referred to herein as the "Deceptive Emissions Scheme").  The Deceptive Emissions Scheme involved a number of Audi gasoline vehicles (collectively referred to as the "Fraudulent Vehicles"), including those acquired by Plaintiffs and described above.

33.     The centerpiece of the Deceptive Emissions Scheme was the use of, in the Fraudulent Vehicles, a secretly embedded software algorithm that was designed and installed to cheat emission tests (herein referred to as the "Cheat Device"), thereby fooling the Environmental Protection Agency ("EPA") and other regulators, into approving the Fraudulent Vehicles for sale and thereby tricking and defrauding consumers into buying and/or leasing more than a hundred thousand vehicles.

34.     The Cheat Device detects when the engines in the Fraudulent Vehicles are being tested in a laboratory or smog station and trigger performance-sapping controls to simulate compliance with emission laws when under testing conditions. But when the test ends, and the driver returns to the road under normal operation and use, the performance—and the illegal pollution—returns.  In short, the Audi Gasoline Defendants figured out a computer-driven methodology and technique to cheat the emissions system – simply run the vehicle in an eco-friendly compliant mode when being tested and in normal dirty mode when it was out on the road

ways being driven by consumers. Plain and simple: it was an intentional plan, scheme and design to lie and cheat consumers, including Plaintiffs in this lawsuit.

35. For years, the defendants got away with Deceptive Emissions Scheme, including the Cheat Device, without detection as Fraudulent Vehicles were sold in large numbers into our stream of commerce. Once out of the testing facilities and on the roads, these cars emit harmful levels of Caron Dioxide (CO2) emissions into the air. When being driven on the road, they also emit more NOx and carbon monoxide than the levels reported by emission testing and advertised by the Audi Gasoline Defendants. When being driven on the road, they also achieve less fuel economy than represented and advertised by the Audi Gasoline Defendants.

36. CO2 is a significant greenhouse gas, and the excessive emission of carbon dioxide is a major cause of global warming and ocean acidification. For this reason, the EPA and CARB regulate emissions of carbon dioxide from vehicles sold in the United States and California.

37. Because of the Audi Gasoline Defendants' actions, the Fraudulent Vehicles that were sold to Plaintiffs are not what the Audi Gasoline Defendants promised. During normal operation, these vehicles pollute the atmosphere with much higher levels of pollutants and greenhouse gases than the artificially-manipulated test results disclose, or than are permitted by federal and state environmental protection laws. Meanwhile, when the engine and transmission are operated in a manner that actually limits pollution as certified and advertised, the vehicles cannot deliver the performance that the Audi Gasoline Defendants promised and advertised.

38. The Audi Gasoline defendants used known fraudulently obtained EPA Certificates of Conformity ("COCs"), as well as California Air Resources Board ("CARB") Executive Orders ("EOs"), to sell and market more than a hundred thousand Fraudulent Vehicles solely in the name of profit and greed. And in trying to quench their need for such, being dishonest, fraudulent and

criminal was of no deterrent value and cheating and stealing from their own consumers was of no consideration.

39. Plaintiffs in this lawsuit were duped – plain and simple. They got sucked in by the Defendants' lies and fraudulent scheme and acquired their Fraudulent Vehicles based on the patently false representations that the vehicles had low emissions, got good gas mileage, and complied with federal, state, and local emissions laws and regulations.

40. All of the defendants in this lawsuit played a role and participated in the Deceptive Emissions Scheme, including the creation, use, and deception related to the Cheat Device.

41. All of the plaintiffs in this lawsuit acquired one of the Fraudulent Vehicles without knowledge of Deceptive Emissions Scheme or the Cheat Device.

42. The Deceptive Emissions Scheme, including the Cheat Device, was dastardly.

43. The Deceptive Emissions Scheme, including the Cheat Device, was criminal.

44. The Deceptive Emissions Scheme, including the Cheat Device, was intentionally designed to defraud and cheat consumers, including Plaintiffs – which it did.

**Defendants' Scheme to Install Defeat Device**

45. The history of the Audi Gasoline Defendants' development of the gasoline Cheat Devices is not as publicly known as the history of their now-infamous diesel defeat device that became known as the "Dieselgate" scandal. From what is known now, though, it appears the Audi Gasoline Defendants developed the Cheat Device at issue in this lawsuit concurrently with their diesel cheat device as part of an overall fraudulent scheme to deal with emissions engineering problems through cheating and deception.

46.     Since 2011, $CO_2$ emissions standards have been increasing, putting increasing pressure on automobile manufacturers, like the Audi Gasoline Defendants, to design and development more environmentally friendly vehicles.

47.     The Audi Gasoline Defendants knew that in order sell the Fraudulent Vehicles in the United States, the vehicles had to meet the relevant standards.  Before introducing a Fraudulent Vehicle into the U.S. stream of commerce (or causing the same), the Audi Gasoline Defendants were required to first apply for, and obtain, an EPA-administered COC, certifying that the vehicle comported with the emission standards for pollutants.  The Clean Air Act ("CAA") expressly prohibits automakers, like the Audi Gasoline Defendants, from introducing a new vehicle into the stream of commerce without a valid EPA COC.  Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. California's emission standards were even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

48.     The CAA prohibits Cheat Devices like the ones installed in the Fraudulent Vehicles.  Moreover, in order to obtain a COC, automakers must submit an application that lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.  The Audi Gasoline Defendants fraudulently obtained a COCs and EOs for the Fraudulent Vehicles by hiding the existence of the Cheat Device.

49.     The Audi Gasoline Defendants were aware that emissions and fuel consumption are decisive factors for customers making vehicle purchase decisions. To that end the Audi

Gasoline Defendants began to mislead consumers by representing their vehicles as consuming less fuel and emitting less $CO_2$ and other pollutants than they actually do in normal driving conditions.

50.     The Audi Gasoline Defendants were able to disguise this deception by programming the Fraudulent Vehicles with the ability to engage different modes, one of which used significantly less fuel and emitted significantly less pollutants, but also delivered significantly less power. The Audi Gasoline Defendants deceptively labeled this the "warm-up" strategy, a mode that activates when the Fraudulent Vehicles are started.  As long as the "warm-up" function remains activated, the automatic transmission remains in a "switching program" that produces a low engine speed, consumes less fuel, and produces less $CO_2$ and other pollutants. However, this "warm up" mode remains active only until the steering wheel is turned 15 degrees or more, at which point the engine management computer switches the transmission into normal mode, wherein the transmission shifts at normal, higher RPM, offering higher performance, lower fuel economy, and significantly greater carbon dioxide and other pollutant emissions.

51.     During emissions testing, which typically takes place on a dynamometer, the car remains in "warm-up" mode indefinitely, because the steering wheel is not turned.  Meanwhile, in normal driving conditions, any turn that requires the steering wheel to be rotated more than 15 degrees, and the car switches to its normal shifting program, resulting in lower fuel economy, and significantly greater carbon dioxide emissions and other pollutants.

52.     In February 2013, the Audi Gasoline Defendants tested their cars in the "SummerFahrt," or Summer Drive, in South Africa. The final report reflected that the shift quality and issues at the start were noticeable. It was in this report that Audi engineer Axel Eiser made his now-notorious comment that the cycle-optimized "shifting program" was to be set to operate 100% when being tested, and be noticeable only .01% of the time when driven normally.

53.     The defeat device software is embedded in the Transmission Control Module ("TCM"). The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work in tandem to execute the actual cheat function. The engineers embedded the cheat software in the TCM unit, intentionally making its detection less probable

54.     Volkswagen and Audi engineers figured out how to activate this low fuel, low emissions, low power "warm-up" mode during emissions tests. They discovered that only time the Fraudulent Vehicles would run continuously with no steering wheel input would be when the vehicles were undergoing examination in a lab, on a dynamometer. When sensors detect these lab conditions, the vehicles' TCM set "shift points"—the engine speeds at which the transmission shifts up to the next gear—that allow the vehicles to produce compliant emission results under those conditions (known by Audi as the "dyno calibration" mode). Thus, on a dynamometer, where the steering wheel is never turned, the Cheat Device enables the Fraudulent Vehicles to operate in this low power mode.

55.     At all other times—that is, when the Fraudulent Vehicles are actually driving under normal conditions—the transmission computer switches to "road calibration" mode, which offers full power to the driver, and which results in increased fuel consumption and greater emissions. Indeed, the road calibration mode activates once the driver turns the steering wheel 15 degrees, something that happens almost immediately under nearly all normal driving conditions.

56.     This Deceptive Emission Scheme allowed the Audi Gasoline Defendants to trick governmental authorities and the public as to the Fraudulent Vehicles' fuel consumption and emissions levels.

57.     A vehicle's advertised fuel economy, which is listed on the "Monroney sticker," or window sticker, is determined by driving a vehicle over five standardized driving patterns (or drive cycles), all of which are performed in a laboratory on a dynamometer where the conditions for all tests can be controlled. During each of the drive cycles, the Fraudulent Vehicles were assessed under a low power, low emissions, low fuel consumption mode.  Based on the way the Monroney sticker is calculated, as the amount of $CO_2$ produced increases, the gasoline used increases and the fuel economy decreases. Therefore, if a vehicle produces less $CO_2$ during laboratory testing, but higher $CO_2$ when driven on road, the vehicle would have better estimated fuel economy represented on the Monroney sticker than the vehicle would actually achieve on the road.  That is exactly what happened here with regard to the Fraudulent Vehicles.  The Cheat Device essentially tricked the Monroney testing into giving the false impression that the Fraudulent Vehicles had better mileage and emissions levels than they did.

58.     There is no question that the Audi Gasoline Defendants knew what they were doing. Indeed, they commissioned their own study at one point and found that certain Fraudulent Vehicles' fuel consumption on the road increased by 8.5 percent after the wheel was turned.

59.     The Audi Gasoline Defendants' developed the Cheat Device because they could not deliver all that they promised Plaintiffs with the Fraudulent Vehicles.  By improving fuel economy to comply with new, stringent fleet-wide $CO_2$ emissions standards (so that they would be allowed to sell cars in the United States at all), the Audi Gasoline Defendants found that the resulting driving experience was unacceptable in light of its advertised emphasis on performance. The Audi Gasoline Defendants decided to conceal the low-power mode from the consumer, including Plaintiffs, and make it active, in effect, only when the vehicles were undergoing emissions testing—when the steering wheel is not turned. Audi executives were aware of the risk

that consumers would complain about the discrepancy between advertised fuel economy achieved during certification testing and what they would experience in the real world but nonetheless elected to conceal the "low-power" mode from consumers and regulators alike.

60.     The Audi Gasoline Defendants designed, manufactured, sold, and distributed the Fraudulent Vehicles to third-parties, including dealers, with full knowledge of the aforementioned defects with the Fraudulent Vehicles and with the intent that dealers would repeat to customers, like Plaintiffs, the aforementioned misrepresentations.

## The Discovery of the Cheat Device

61.     In late 2015 or early 2016, German authorities—namely, the German Motor Transportation Authority ("KBA")—detected irregularities and increased $CO_2$ emissions in Audi vehicles and questioned Audi about these results.  The Audi Gasoline Defendants lied to the KBA, however, telling them that their vehicles would not contain software allowing them to detect dynamometer testing and alter the vehicles' performance as a result. The Audi Gasoline Defendants instead pointed to a number of factors that could have distorted the measurement results.

62.     German authorities continued to press forward, however, and renewed their investigations.

63.     Audi executives were on notice of the potential for $CO_2$ emissions manipulation well before the Audi $CO_2$ defeat device was publicized. Following the public revelation of the diesel defeat device in the "Clean Diesel" vehicles in September 2015 by CARB and the EPA, another investigation began to unfold, this one relating to $CO_2$.  In November 2015, new Volkswagen CEO Matthias Müller announced that internal investigations had identified irregularities in $CO_2$ levels, and that around 800,000 Group vehicles could be affected. A

Volkswagen announcement did not specifically identify the vehicles, but stated in relevant part: "…during the course of internal investigations irregularities were found when determining type approval $CO_2$ levels. Based on present knowledge around 800,000 vehicles from the Volkswagen Group could be affected. An initial estimate puts the economic risks at approximately two billion euros. The Board of Management of AG will immediately start a dialogue with the responsible type approval agencies regarding the consequences of these findings."

64.     In December 2015, in a statement to investors, Mueller changed course, reporting that the Audi Gasoline Defendants had in fact made a mistake and that there was no such scandal. It was announced that "[t]he suspicion that fuel consumption figures of current production vehicles had been unlawfully changed was not confirmed…These cars can be offered for sale by dealers without any reservations."

65.     More than half a year later, European officials again questioned Defendants about carbon emissions. Even then, Defendants continued to deny a problem. At no point in time did the Audi Gasoline Defendants inform the public or Plaintiffs that they had obtained the COCs and EOs through the use of a $CO_2$ defeat device, or that its emissions and fuel efficiency representations for the Fraudulent Vehicles were false.

66.     Since at least 2013 at Audi and Volkswagen executives were aware and concerned about the $CO_2$ defeat device—including the fact that the software constituted a defeat device—and the risk of regulatory investigations.  Moreover, Volkswagen's now-former CEO, Martin Winterkorn, knew about the defeat device scheme well before the scandal broke.  Indeed, prosecutors in Germany, are investigating Winterkorn for fraud, believing he had sufficient knowledge of the scheme.

67.     Following the revelations regarding the CO2 defeat device, Audi reportedly suspended several unidentified "responsible engineers." However, Axel Eiser remains Head of Powertrain Development of the Volkswagen Group. Defendants have even relied on Eiser to interface with regulators.

### Publicly Revealed Testing Confirms the Existence of the Cheat Device

68.     Recently, testing of Fraudulent Vehicles by private parties has been made public in court filings.  This testing confirms the existence and functionality of the Cheat Device.

69.     Testing was conducted to determine whether there was a difference in fuel economy for certain Fraudulent Vehicles when tested using the federal certification tests, with and without turning the vehicle wheels more than 15 degrees prior to testing.  Test results showed that in certain Fraudulent Vehicles, fuel economy was higher with no wheel movement before testing than in testing that followed moving the steering wheel fully to the right and left after engine start and just prior to the drive cycle starting, indicating that steering input triggers a switch between modes. The difference in fuel economy was as high as nine percent between the two modes.

70.     Further testing  shows the existence of a defeat device that increases fuel economy (reducing carbon dioxide production) when the steering wheel is not turned, and that it does so by instructing the transmission to shift at lower engine speed, operating at a lower average RPM.

71.     There has also been testing of Fraudulent Vehicles that have been "reflashed" with a software update as part of an emissions recall that received regulatory approval on September 16, 2016.  Further, experts have conducted on-road testing on several 3.0L Fraudulent Vehicles using portable emissions measurement systems ("PEMS").  These tests support conclusion that the Fraudulent Vehicles are equipped with Cheat Devices.

### Defendants' False Advertising

72.     In addition to directly falsely advertising to Plaintiffs emissions compliance and fuel economy regarding the Fraudulent Vehicles, the Audi Gasoline Defendants advertised their concern for the environment even while selling vehicles equipped with Defeat Devices that polluted at levels far greater than legal limits. For example, on the "Environment" page of its website, Volkswagen Group of America, Inc., stated as late as September 2015 that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives." That "integrated strategy" for reducing emissions seems to have consisted only of cheating emissions testing so that Volkswagen and Audi vehicles only appeared to offer reduced emissions, while continuing to pollute.

73.     Long after Defendants became aware that many of their vehicles were deliberately designed to cheat emissions tests, and even after EPA and CARB issued Notices of Violation for their diesel vehicles, Defendants continued to mislead consumers. While sales of new diesel vehicles equipped with the diesel defeat device ceased in late 2015, news reports indicate that Audi did not stop producing gasoline vehicles equipped with the Cheat Device until May 2016, a full eight months after the 2015 diesel scandal broke.

74.     Audi television advertisements use the tagline "Truth in Engineering" as their motto.  Unfortunately for consumers who bought the Fraudulent Vehicles, the Audi Gasoline Defendants' engineering was far from "truthful," and their professed commitment to environmental consciousness was illusory.  They have designed and sold cars that emit pollutants

at breath-taking levels, and they disguised it by engineering them to detect and then cheat on state and federal environmental testing.

**Defendants Intentionally Hid the Excessive Pollution Emitted By the Fraudulent Vehicles**.

75.     Defendants' Defeat Device is part of a computerized engine control system that monitors sensors throughout the cars' engine, transmission, and exhaust systems and controls operation of the cars' systems to ensure optimal performance. Here, the Audi Gasoline Defendants programmed the engine control computers in the Fraudulent Vehicles with software that effectively detects when the vehicle is undergoing emissions testing by turning off a low-emitting gear-shifting program only once the steering wheel is turned more than fifteen degrees. This ensures that the engine never revs above a certain, unrealistically low engine speed during emissions testing, resulting in less fuel burnt and less carbon dioxide emitted than under normal driving conditions. When the car is not being emissions tested—that is, under the vast majority of normal operating conditions—the engine control systems operate the engine and transmission in a manner that does not comply with EPA or CARB emissions requirements.

76.     In short, this software allows the Fraudulent Vehicles to meet emissions standards in labs or state testing stations while permitting the vehicles to emit carbon dioxide at levels far above the standard allowed under United States laws and regulations during normal operation.

77.     The Audi Gasoline Defendants have a history of cheating on emissions.  The "Dieselgate" Scandal was not the first time that the Audi Gasoline Defendants allegedly engineered vehicles to cheat emission standards.  Volkswagen paid a $120,000 fine to the EPA in 1974 in order to settle charges that "it gamed pollution control systems in four models by changing carburetor settings and shutting off an emissions-control system at low temperatures."

78.     Moreover, Defendants were warned as long ago as 2007 by suppliers and their own employees not to cheat on emissions tests.  In 2007, supplier Bosch warned the Defendants not to use cheat software during regular operation.  Also, in 2011, a technician raised concerns about illegal practices in connection with emissions levels.

79.     Despite those warnings, the Audi Gasoline Defendants manufactured, marketed, and sold cars with Defeat Devices designed to allow higher levels of pollutant emissions than those allowed by state and federal law, thus defrauding their customers, including Plaintiffs.

**The Deceptive Emissions Scheme Caused Extensive Harm to Plaintiffs.**

80.     The Deceptive Emissions Scheme duped Plaintiffs and consumers into acquiring Fraudulent Vehicles that never should have left the factory, let alone been sold.

81.      In addition, a premium was charged for the Fraudulent Vehicles, as compared to non-luxury, high performance vehicles.

82.     Plaintiffs acquired their Fraudulent Vehicles based on Defendants' fraudulently obtained COCs from the EPA to induce Plaintiffs to acquire these vehicles. Plaintiffs also acquired their vehicles based on Defendant's false representations and advertisements regarding performance and fuel economy.  Plaintiffs acquired the Fraudulent Vehicles based on these claims, and were harmed as a result.

83.     Defendants' illegal and deceptive actions have caused Plaintiffs significant harm. Even if Defendants were to repair the Fraudulent Vehicles so that they comply with emissions requirements, the repair would not compensate Plaintiffs for the significant harm Defendants' deception has caused.  First, any repairs performed as part of the recall are likely to significantly diminish the performance (and thus the value) of the Fraudulent Vehicles. Specifically, any software "repair" that reprograms the Fraudulent Vehicles to operate within legal emissions limits

at all times (and not just during testing) will cause the performance of the Fraudulent Vehicles to suffer, and they will not perform as they were advertised and marketed to Plaintiffs.

84.     Second, even if a more functional repair is possible (and to date none has been suggested), it could not compensate for the financial damages Plaintiffs have suffered, including the premiums Plaintiffs paid to own high-performing, luxurious Audi-branded vehicles that complied with emissions requirements and comported with Audi's advertised commitment to the environment and the inevitable reduction in resale value caused by any recall to repair the vehicles and any resulting diminished performance.

85.     Third, Plaintiffs are already experiencing reputational harm as they are unwilling accomplices to Defendants' pollution-producing scheme.

86.     For those reasons, as a result of Defendants' unfair, deceptive, and fraudulent business practices, and their failure to disclose that the Fraudulent Vehicles utilize a Cheat Device to cheat emissions tests, owners and/or lessees of the Fraudulent Vehicles, including Plaintiffs, have suffered losses in money and property.

87.     Had Plaintiffs known of the Cheat Device at the time they acquired their Fraudulent Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

88.     Plaintiffs have suffered damages as a result their purchases of the Vehicles, including but not limited to (i) overpayment for a vehicle that is incapable of performing as represented, (ii) future additional fuel costs, (iii) loss of performance from future repairs, and (iv) diminution of vehicle value.

89.     In sum, Defendants' deliberate strategy to value profit over the truth, human health, and the environment, has caused serious harm to consumers nationwide.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

90.     The tolling doctrine was made for cases of fraudulent concealment like this one. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that the defendants had conspired to install software that would evade emissions regulations, and that the defendants were concealing and misrepresenting the true emissions levels of its vehicles.

91.     The fraud, as set forth herein, was elaborate and well concealed.

92.     Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

93.     Plaintiffs could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers.

94.     Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of their sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs immediately before this action was filed.

### Fraudulent Concealment

95.     All applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

96.     Upon information and belief, prior to the date of this Complaint and before any Plaintiff acquired his or her Fraudulent Vehicle, if not earlier, the Audi Gasoline Defendants knew of the Cheat Device in the Fraudulent Vehicles, but continued to distribute, sell, and/or lease the

Fraudulent Vehicles to Plaintiffs. In doing so, Defendants concealed and expressly denied the existence of problem with $CO_2$ emissions, and/or failed to notify Plaintiffs about the true nature of the vehicles.

97.    Instead of disclosing their deception, or that the emissions from the Fraudulent Vehicles were far worse than represented, Defendants falsely represented that their vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

98.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge active concealment of the facts alleged herein.

**Estoppel**

99.    Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Fraudulent Vehicles, including their emissions systems and their compliance with applicable federal and state law.

100.    Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Fraudulent Vehicles, actively concealed the true character, quality, and nature of the Fraudulent Vehicles, and knowingly made misrepresentations about the quality, reliability, characteristics, and/or performance of the Vehicles.

**American Pipe Tolling**

101.    Under the U.S. Supreme Court's decision in A*merican Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, any applicable statutes of limitation were tolled by the

filing of the federal class action complaint in In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, 3:15-md-02672-CRB (N.D. Cal.).

102.    Based on the foregoing, Defendants are estopped and precluded from relying on any statute of limitations in defense of this action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Express Warranty- Song-Beverly Consumer Warranty Act,**
***Civil Code* Section 1790, *et seq*.**

103.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

104.    Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

105.    Plaintiffs acquired the Fraudulent Vehicles in California; therefore, they are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

106.    The Fraudulent Vehicles are "consumer good[s]" within the meaning of Cal. Civ. Code § 1791(a).

107.    Defendants are "manufacturers" and "distributors" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

108.    Plaintiffs acquired Fraudulent Vehicles manufactured and distributed by Defendants.

109.    Plaintiffs' acquisitions of their Fraudulent Vehicles were accompanied by express warranties.

110.    The Vehicles have numerous defects and nonconformities covered by the express terms of the warranties which manifested within the applicable express warranty periods.  The nonconformities substantially impair the use, value and/or safety of the Fraudulent Vehicles to a

reasonable person in Plaintiffs' situation.

111.    Plaintiffs delivered the Fraudulent Vehicles to Defendants and/or their authorized repair facility for repairs on numerous occasions in attempts to have the existing express warranties satisfied.

112.    Defendants and/or their authorized repair facilities failed to repair the defects and/or nonconformities to match the written warranty after a reasonable number of attempts and, as such, have failed to comply with and have breached all applicable warranty requirements.

113.    Despite their breaches of express warranties, Defendants have refused and continue to refuse to promptly comply with Plaintiffs' demands for a refund or replacement of the Fraudulent Vehicles.

114.    As a result of Defendants' failure to remedy the defects as alleged above and promptly issue a refund or replacement of the Fraudulent Vehicles, Defendants are in breach of their obligations under the Song-Beverly Consumer Warranty Act.

115.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs sue Defendants for damages and other legal and equitable relief including, at their election, all sums paid for their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles. Plaintiffs further sue Defendants for civil penalties in amount to be determined at trial because Defendants' continuing breaches of their obligations as set forth herein are willful.  Pursuant to Cal. Civ. Code § 1794, Plaintiffs further sue Defendants for costs and attorneys' fees.

### SECOND CAUSE OF ACTION
**Breach of Implied Warranty- Song-Beverly Consumer Warranty Act,**
**Civil Code Section 1790, *et seq*.**

116.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

117.    Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

118.    Plaintiffs acquired the Fraudulent Vehicles in California; therefore, they are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

119.    The Fraudulent Vehicles are "consumer good[s]" within the meaning of Cal. Civ. Code § 1791(a).

120.    Defendants are "manufacturers" and "distributors" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

121.    At the time Plaintiffs acquired their Fraudulent Vehicles and all relevant times thereafter Defendants warranted to undertake to preserve or maintain the utility or performance of said vehicles.

122.    At the time of purchase, Defendants were in the business of manufacturing, distributing and/or selling motor vehicles.

123.    Defendants impliedly warranted to Plaintiffs that the Fraudulent Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fraudulent Vehicles do not have the quality that a buyer or lessee would reasonably expect.

124.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

125.   The Fraudulent Vehicles would not pass without objection in the automotive trade because of the defects in the Fraudulent Vehicles' engine system. Specifically, the Fraudulent Vehicles do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative. In addition, the engine system was not adequately designed, manufactures, and tested.  Further, the Fraudulent Vehicles do not obtain the fuel economy or performance as warranted.

126.   Because of the defects in the Fraudulent Vehicles' engine system, they are not in merchantable condition and thus not fit for ordinary purposes.

127.   The Fraudulent Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Fraudulent Vehicles' engine system.

128.   Defendants breached the implied warranty of merchantability by manufacturing and selling Fraudulent Vehicles containing defects associated with the engine system. Furthermore, these defects have caused Plaintiffs to not receive the benefit of their bargain and have caused Fraudulent Vehicles to depreciate in value.

129.   As a direct and proximate result of Defendants' breaches of the implied warranties of merchantability, Plaintiffs received goods whose defective condition substantially impairs their value to Plaintiffs. Plaintiffs have been damaged as a result of the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Fraudulent Vehicles

130.   Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs sue Defendants for damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles. Plaintiffs further sue Defendants for civil penalties in amount to be determined at trial because of

Defendants' willful failure to comply with their obligations to Plaintiffs.  Pursuant to Cal. Civ. Code § 1794, Plaintiffs further sue Defendants for costs and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Violation of California Consumer Legal Remedies Act-**
**Civil Code Section 1750,** *et seq.*

131.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

132.    Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

133.    Defendants are "person[s]" under Cal. Civ. Code § 1761(c) and § 1770 and sell "goods" and "services" within the meaning of Civil Code §1761(e) and §1770.

134.    Plaintiffs are "consumers" within the meaning of Civil Code §1761(d) and §1770.

135.    Plaintiffs engaged in a "transaction" within the meaning of Civil Code §1761(e), including the acquisition of the Fraudulent Vehicles from Defendants and the presentation of the Fraudulent Vehicles to Defendants for repair or replacement of the defect.

136.    As set forth herein, Defendants' acts and practices violate Civil Code §§1750, *et seq.*, including without limitation Civil Code §§1770(a)(9), (a)(14), (a)(16) and (a)(19), in that Defendants: (a) represented that its goods have sponsorship, approval, characteristics, uses, or benefits which they do not have; (b) represented that its goods are of a particular standard, quality, or grade, but are of another; (c) advertised its goods with the intent not to sell them as advertised; (d) represented that a transaction conferred or involved rights, remedies, or obligations which it did not have or involve; and (e) represented that its goods were supplied in accordance with a previous representation when they were not.

137.    In the course of their business, the Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent

26

Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.

138.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the CLRA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

139.    Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

140.    Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

141.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

142.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

143.    Defendants knew or should have known that their conduct violated the CLRA.

144.     Defendants owed Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from Plaintiffs; and/or

    c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

145.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

146.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

147.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

148.   Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

149.   Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the CLRA in the course of their business.

150.   Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) as determined at trial plus restitution plus costs of court and litigation and attorneys' fees under Cal. Civ. Code § 1780 plus any other just and proper relief available under the CLRA.  Plaintiffs also seek punitive damages against Defendants because Defendants carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result. Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed

material facts that only Defendants knew. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

## FOURTH CAUSE OF ACTION
### Violations of California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et. seq.*

151.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

152.    Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

153.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

154.    Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

A.    by knowingly and intentionally concealing from Plaintiffs that the Fraudulent Vehicles suffer from a design defect while obtaining money from Plaintiffs;

B.    by marketing Fraudulent Vehicles as possessing functional and defect-free, EPA-compliant engine systems;

C.    by purposefully installing an illegal "defeat device" in the Fraudulent Vehicles to fraudulently cause Fraudulent Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

D.    by violating federal laws, including the Clean Air Act; and

E.    by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

155.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs members to make their purchases or leases of their Fraudulent Vehicles. Absent those misrepresentations and omissions, Plaintiffs Class members would not have purchased or leased these vehicles, would not have purchased or leased these Fraudulent Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defeat device that failed to comply with emissions standards.

156.    Accordingly, Plaintiffs have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

157.    Plaintiffs sue Defendants for orders or judgments to restore to Plaintiffs any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below. Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) as determined at trial plus costs of court and attorneys' plus any other just and proper relief available under California law.  Plaintiffs also seek punitive damages against Defendants because Defendants carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result.  Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Defendants knew. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages

### FIFTH CAUSE OF ACTION
**False Advertising Under the California Unfair Competition**
**California Business and Professions Code §17500,** *et seq.*

158.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

159.   Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

160.   California Bus. & Prof. Code § 17500 states: "It is unlawful for any …corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

161.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs.

162.   Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Fraudulent Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.  Defendants engaged in unfair business practices by, among other things: (a) Engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff; (b) Engaging in conduct that undermines or violates the stated policies underlying the statute, which seeks to protect consumers against unfair and sharp business practices and to promote a basic level of

honesty and reliability in the marketplace; and (c) Engaging in conduct that causes a substantial injury to consumers, not outweighed by any countervailing benefits to consumers or to competition, which the consumers could not have reasonably avoided.

163.    Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In acquiring their Fraudulent Vehicles, Plaintiffs relied on the misrepresentations and/or omissions of Defendants with respect to the safety, performance and reliability of the Fraudulent Vehicles. Defendants' representations turned out not to be true because the Fraudulent Vehicles are distributed with faulty and defective engine systems, rendering certain safety and emissions functions inoperative, as well as impacting fuel economy and performance. Had Plaintiffs known this, they would not have acquired their Fraudulent Vehicles and/or paid as much for them. Accordingly, Plaintiffs overpaid for their Fraudulent Vehicles and did not receive the benefit of their bargain.

164.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

165.    Plaintiffs sue Defendants for orders or judgments to restore to Plaintiffs any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below. Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) as determined at trial plus costs of court and attorneys' plus any other just and proper relief available under the California law.  Plaintiffs also seek punitive damages against Defendants because Defendants

carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result.   Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Defendants knew. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## SIXTH CAUSE OF ACTION
### Fraud

166.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

167.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.   The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

168.    The Audi Gasoline Defendants valued their profits over the trust that Plaintiffs entrusted to them. Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

169.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

170.    Defendants' false representations and omissions were material to Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, Plaintiffs highly valued that the vehicles they were purchasing or leasing were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

171.    Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

172.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including Plaintiffs.

173.    Defendants had a duty to disclose the Cheat Devices to Plaintiffs.

174.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including Plaintiffs, did not know about (and could not reasonably discover) its scheme.

175.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources.  The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to Plaintiffs.

176.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

177.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of Plaintiffs.

178.    Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

179.    Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

180.    Defendants are liable to Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) in an amount to be proven at trial, for which Plaintiffs sue Defendants. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, with an evil mind, and with intent to defraud Plaintiffs for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants the imposition of substantial punitive and exemplary damages in an amount to be determined at trial, for which Plaintiffs sue Defendants.

### SEVENTH CAUSE OF ACTION
**Negligent Misrepresentation**

181.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

182.    Defendants made material misrepresentations of fact to Plaintiffs concerning the quality and condition of the Fraudulent Vehicles.

183.    At the time the representations were made, Defendants knew, or by the exercise of reasonable care, should have known, that the statements were false and that the Fraudulent Vehicles were defective, as detailed above.

184.     Defendants made such claims about the Fraudulent Vehicles with the intent to induce Plaintiffs to purchase the Fraudulent Vehicles.

185.     Plaintiffs justifiably relied upon Defendants' misrepresentations about the quality and condition of the Fraudulent Vehicles.

186.     Plaintiffs have suffered harm as a result of Defendants misrepresentations and omissions of material fact.

187.     Defendants are liable to Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) in an amount to be proven at trial, for which Plaintiffs sue Defendants.

## EIGHTH CAUSE OF ACTION
### Joint Venture

188.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

189.     Plaintiffs bring this cause of action Defendants VW AG, Audi AG, VW America, and Audi America.

190.     Defendants VW AG, Audi AG, VW America, and Audi America acted in concert and for a common purpose for monetary gain as joint venture partners with an agreement to share the profits, if any, of their unlawful acts, and therefore are jointly and severally liable to Plaintiffs for the damages awarded by this Court.

## NINTH CAUSE OF ACTION
### Civil Conspiracy

191.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

192.    Defendants engaged in civil conspiracy with each other and with person(s) unknown to the Plaintiffs to conceal the defects in the Fraudulent Vehicles.

193.    The conspiracy had the unlawful objective of profiting from the sale of the Fraudulent Vehicles, all of which are defective as described above.

194.    Defendants had a meeting of the minds with each other and person(s) unknown.

195.    In furtherance of this civil conspiracy, Defendants committed the acts alleged herein.

196.    As set forth above, Defendants engaged in unlawful overt acts in furtherance of the conspiracy.

197.    Defendants are jointly and severally liable to Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) in an amount to be proven at trial, for which Plaintiffs sue Defendants. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, with an evil mind, and with intent to defraud Plaintiffs for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants the imposition of substantial punitive and exemplary damages in an amount to be determined at trial, for which Plaintiffs sue Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants, as follows:

A.    Actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress);

B.      Statutory damages;

C.      Civil penalties

D.      Punitive and exemplary damages;

E.      For an award of restitution and disgorgement of profits, or other equitable relief as the Court deems proper;

F.      Rescission;

G.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs of suit and attorneys' fees; and

I.      Such other or further relief as may be appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:   November 2, 2018

Respectfully submitted,

*/s/ Charles Miller*
Charles Miller, Esq.
SBN: 276523
Michael E. Heygood, Esq.
HEYGOOD, ORR & PEARSON
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001

**ATTORNEYS FOR PLAINTIFFS**